UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| KRISTEN BIRMINGHAM, individually and in her capacities as co-executrix of the estate of DENNIS STENAK, SR., and temporary conservator of the person and estate of DENNIS STENAK, SR.,<br>  Plaintiff,<br><br>  v.<br><br>LESLIE COTTON and TOWN OF SOUTHINGTON,<br>  Defendants. | No. 3:08cv671 (SRU) |

## RULING ON MOTION FOR SUMMARY JUDGMENT

The defendants moved for summary judgment on the plaintiff's claims, brought in her individual and representative capacities, for relief pursuant to 42 U.S.C. § 1983. For the reasons set forth below, the defendants' motion is granted.

**I. Background**

The following facts are undisputed, unless indicated otherwise.

This case is about the marriage of Dennis Stenak, Sr., to Veronica Mirisola. In particular, it concerns the constitutionality of the process by which Stenak and Mirisola were married. The plaintiff is Kristen Birmingham, Stenak's daughter, former conservator, and the current co-executrix of his estate. The defendants are Leslie Cotton, the clerk for the Town of Southington, and the Town of Southington, itself.

The controversy stems from a series of events on November 23, 2005. That morning, Cotton received a phone call at her home from Andrew Meade, a friend of Stenak's who served on Southington's town council, asking her to fill out a marriage license for Stenak. Meade reported that Stenak was very sick but wanted to get married immediately. Stenak was, in fact,

terminally ill: in June 2005, he was diagnosed with lung cancer, and in November, he was admitted to hospice care. On November 22, the day before the events of this case, his personal physician, Dr. Craig Bogdanski, saw Stenak after he had suffered a fall, and reported that his illness and pain medication rendered him incompetent.

Cotton agreed to assist Meade and facilitate Stenak's marriage to Mirisola, and filled out a marriage license for the couple based on information provided by Mirisola to her over the phone. That was contrary to town and state regulations requiring a marriage license to be completed in the clerk's presence. After hanging up with Meade and Mirisola, Cotton left her house and drove to Meade's home, where she was to meet Meade and Michael Rossi, a justice of the peace who would perform the marriage. Together, the three of them would travel to Stenak's home for the marriage ceremony. Cotton arrived at Meade's home at approximately 9:20 a.m. After waiting for nearly an hour, she left for work, but gave Meade the completed marriage license, which she signed as if she had witnessed Stenak and Mirisola swear to the information included in it. She instructed Meade that Rossi must make sure that the couple signed the document under oath.

Some time on or before the morning of November 23, 2005, Birmingham became aware of the plan for Stenak to marry Mirisola. That morning, Birmingham met with Dr. Bogdanski to obtain a conservatorship for her father, which would require Birmingham to consent to any matrimonial decision Stenak wished to make. Bogdanski signed the paperwork and affirmed that Stenak was incompetent; Birmingham then filed the conservatorship application with the probate court and was appointed her father's conservator. At some point that day, after Cotton left Meade's home for her office, the probate court called the Southington clerk's office inquiring

about whether a marriage license had been given to Stenak and informing the clerk's office about Birmingham's conservatorship. That was the first time that Cotton became aware that Birmingham was Stenak's conservator. Cotton did not contact Meade or anyone else after she was notified of Stenak's conservatorship.

That evening, between 6 and 7 p.m., Rossi performed the marriage of Stenak and Mirisola at Stenak's home. Stenak was ill and in his bed. There is a dispute whether Rossi witnessed their signatures under oath; Rossi claims that the document was already signed by them when he arrived, while other witnesses claim that Stenak and Mirisola signed the license in his presence. Nonetheless, Rossi performed the marriage. Stenak died four days later, on November 27, 2005. The marriage license and certificate were recorded on November 28, and Stenak's will was entered to probate on December 13, 2005.

On April 18, 2006, Birmingham filed an action in state court against Mirisola seeking a declaratory judgment voiding her marriage to Stenak. With the marriage declared invalid, she could then sue in probate court to contest the disposition of her father's estate. The spur for Birmingham's state court lawsuit appears to be denying Mirisola the right to "take against" Stenak's will. Mirisola was bequeathed property in Stenak's will that was less than one-third of the value of his estate; if, however, she was his wife at the time of death, Mirisola would be entitled to a full third of his property under Connecticut law. Voiding the marriage will prevent Mirisola from taking against Stenak's will.

On May 2, 2008, Birmingham filed this separate federal action against Cotton and the Town of Southington, alleging, pursuant to 42 U.S.C. § 1983, that the defendants had deprived her and her father of their procedural and substantive due process rights. She seeks

compensatory damages, punitive damages, attorneys' fees, and any available declaratory and injunctive relief. The defendants subsequently moved for summary judgment on all of Birmingham's claims for relief.

## II.     Standard of Review

Summary judgment is appropriate when the evidence demonstrates that "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986) (plaintiff must present affirmative evidence in order to defeat a properly supported motion for summary judgment).

When ruling on a summary judgment motion, the court must construe the facts in the light most favorable to the nonmoving party and must resolve all ambiguities and draw all reasonable inferences against the moving party. *Anderson*, 477 U.S. at 255; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970); *see also Aldrich v. Randolph Cent. Sch. Dist.*, 963 F.2d. 520, 523 (2d Cir. 1992) (court is required to "resolve all ambiguities and draw all inferences in favor of the nonmoving party"). When a motion for summary judgment is properly supported by documentary and testimonial evidence, however, the nonmoving party may not rest upon the mere allegations or denials of his pleadings, but must present significant probative evidence to establish a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986); *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995).

"Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper." *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir. 1991); *see also*

*Suburban Propane v. Proctor Gas, Inc.*, 953 F.2d 780, 788 (2d Cir. 1992). If the nonmoving party submits evidence that is "merely colorable," or is not "significantly probative," summary judgment may be granted. *Anderson*, 477 U.S. at 249-50.

> The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact. As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted.

*Id.* at 247-48. To present a "genuine" issue of material fact, there must be contradictory evidence "such that a reasonable jury could return a verdict for the non-moving party." *Id.* at 248.

If the nonmoving party has failed to make a sufficient showing on an essential element of his case with respect to which he has the burden of proof at trial, then summary judgment is appropriate. *Celotex*, 477 U.S. at 322. In such a situation, "there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 322-23; *accord Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995) (movant's burden satisfied if he can point to an absence of evidence to support an essential element of nonmoving party's claim). In short, if there is no genuine issue of material fact, summary judgment may enter. *Celotex*, 477 U.S. at 323.

**III. Discussion**

A plaintiff seeking relief for the violation of her procedural due process rights must first prove that she has a life, liberty, or property interest protected by the Due Process Clause; once she has made that initial showing, a plaintiff must then demonstrate that the state – or, in this

case, a municipality and its agent – deprived her of that interest without providing adequate process. *Sealed v. Sealed*, 332 F.3d 51, 55 (2d Cir. 2003). That second showing requires a balancing of three factors: the interest of the individual, the risk of erroneous deprivation relative to the effectiveness of other additional safeguards, and the interest of the government. *Rivera-Powell v. N.Y. City Bd. of Elections*, 470 F.3d 458, 466 (2d Cir. 2006) (quoting *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976)). Alternatively, a plaintiff seeking relief for the violation of her substantive due process rights must establish that the government's conduct was so arbitrary or egregious that it "shocks the conscience," and that the government infringed on fundamental rights "implicit in the concept of ordered liberty" not protected by other textual provisions of the Constitution. *United States v. Salerno*, 481 U.S. 739, 746 (1987).

Birmingham alleges that Cotton and the town of Southington violated her and her father's due process rights when they facilitated Stenak's invalid marriage to Mirisola. Primarily, Birmingham maintains that her and her father's procedural due process rights were violated because they were both erroneously deprived of property interests – she of the right to receive the part of her father's estate that went to Mirisola, and he of the right to dispense his property according to his wishes – without adequate procedural safeguards. Birmingham contends that her and her father's substantive due process rights were violated as well. That claim alleges that she and her father held fundamental property and/or liberty interests that the defendants not only violated, but did so in a way that "shocks the conscience" of the court.

I address Birmingham's procedural and substantive due process claims against each

defendant separately.[1]

      A.      Claims against Cotton

In order to assess the defendants' motion for summary judgment for Birmingham's claims against Cotton, it is helpful first to distinguish the three different capacities in which Birmingham is suing: in her own individual capacity, as her father's conservator, and as the co-executrix of her father's estate. Birmingham only has viable claims in her capacity as co-executrix, and, as I explain, those claims present no genuine issue of material fact. Cotton is thus entitled to summary judgment on Birmingham's due process claims against her.

      1.      *Claims brought in Birmingham's individual capacity*

In order for Birmingham's claim in her individual capacity to succeed, she must have been deprived of a constitutionally protected liberty or property interest when her father married Mirisola, and not at some later date. *See Zahra v. Town of Southold*, 48 F.3d 674, 680 (2d Cir. 1995) ("To state a . . . due process claim, a party must first establish that he had a valid 'property interest' in a benefit that was entitled to constitutional protection at the time he was deprived of

---

[1] The defendants claim in their memorandum in support of summary judgment that Birmingham's section 1983 action is neither constitutionally nor prudentially ripe because the state court has yet to rule on whether Stenak's marriage to Mirisola was valid. That argument is unpersuasive because it conflates two types of actions Birmingham can bring. In state court, Birmingham is attempting to nullify her father's marriage and, by extension, recoup the part of her father's estate that Mirisola received. Her federal action, however, seeks something different: compensation and other relief on account of the failure of Southington and its agent to provide the process due her father with respect to the issuance of his marriage license. Birmingham's state claim can be thought of as a complaint about the *substance* of Stenak's marriage and ultimate disposition of his estate – that is, whether they are legally valid under state law. By contrast, Birmingham's federal claim is principally a complaint about the constitutionality of the *process* by which Stenak was married, which affects the distribution of his estate. The former has no bearing on the latter's ripeness; once Stenak was, as alleged, deprived of liberty and property without due process, Birmingham had a concrete claim on Stenak's behalf ready for adjudication.

that benefit."). Her only personal interest in the validity of her father's marriage is her interest in receiving her full share of her father's estate. Birmingham's due process claim therefore hinges on the existence of an inheritor's property interest in a testator's estate before his death.

> To determine whether a plaintiff was deprived of property without due process of law in violation of the Fourteenth Amendment, we must identify the property interest involved. . . . This involves a two-step process. First, we must determine whether some source of law other than the Constitution, such as a state or federal statute, confers a property right on the plaintiff. . . . Once such a property right is found, we must determine whether that property right constitutes a property interest for purposes of the Fourteenth Amendment.

*Taravella v. Town of Wolcott*, 599 F.3d 129, 133 (2d Cir. 2010) (quotations omitted).

Property interests in a decedent's estate are governed by the state's laws of inheritance – specifically, the laws of wills and intestacy. *See Irving Trust Co. v. Day*, 314 U.S. 556, 562 (1942) ("Rights of succession to the property of a deceased, whether by will or intestacy, are of statutory creation, and the dead hand rules succession only by sufferance."). Connecticut law is clear that a beneficiary has no legally protected interest in or entitlement to a decedent's estate while the testator is still alive; at most, such a potential beneficiary has an "expectancy," which affords no legal rights.

> 'Expectancy' is the bare hope of succession to the property of another, such as may be entertained by an heir apparent. Such a hope is inchoate. It has no attribute of property, and the interest to which it relates is at the time nonexistent and may never exist. . . . The moment of the decedent's death determines the right of inheritance or testamentary succession.

*Krause v. Krause*, 174 Conn. 361, 365 (1978) (citation omitted); *accord Irving Trust*, 314 U.S. at 562 ("Expectations or hopes of succession, whether testate or intestate, to the property of a living person, do not vest until the death of that person.").

The Connecticut Supreme Court recently distinguished the rights of an expected

beneficiary from those of a contingent beneficiary – that is, a party whose rights vested under a will are not guaranteed but depend on future external events. In *Gaynor v. Payne*, 261 Conn. 585 (2002), the Court held that contingent remaindermen – specifically, the testator's grandchildren who would take under the will only after the deaths of their parents – had standing to sue a former executor of their estate, despite the uncertainty of their eventual bequests. The touchstone for a beneficiary's right to sue is not the contingency of her right, but whether, under Connecticut law, her rights have vested and are therefore enforceable. "Enforceability is the dispositive factor in deciding whether a given interest is an expectancy or, instead, a legally cognizable property interest." *Id.* at 593. A contingent remainder is considered "an enforceable, presently existing property right" even though its possessor may have no present right to take property under a decedent's will. *Id.* at 593-94. But the Connecticut Supreme Court has consistently held that no beneficiary or inheritor has a "legally cognizable property interest" under Connecticut law until the decedent dies. *Id.* at 593; *Krause*, 174 Conn. at 365. At best, such a beneficiary or inheritor has a unilateral hope of one day receiving some portion of the decedent's estate. A mere hope, however, does not afford enforceable property rights.

Given that body of Connecticut law, Birmingham, at the time of her father's marriage, had no property interest in receiving a share of her father's estate either through her father's will or through the rules of intestacy. On the contrary, when her father married Mirisola, Birmingham held an expectancy, which state law does not consider to be a valid property interest. Thus, Birmingham's claim that her individual due process rights were violated fails on the first step of analysis: she had no property interest in receiving any bequest from her father while he was still alive and, therefore, she has no process due her under the Fourteenth Amendment with respect to

the administration of her father's marriage to Mirisola.

        2.    *Claims brought in Birmingham's capacity as conservator and co-executrix of Stanek's estate*

Although Birmingham in her individual capacity lacks a property interest protected by the Due Process Clause, she may possess a property interest insofar as she is suing on her father's behalf. The defendants argue that Birmingham may pursue such a claim only as co-executrix of his estate, and not also as his conservator. They are correct. When a plaintiff with a section 1983 claim dies before the inception of his litigation, his claim "survives for the benefit of his estate if applicable state law creates a right of survival." *Barrett v. United States*, 689 F.2d 324, 331 (2d Cir. 1982). Under Connecticut law, that right of survival belongs to the decedent's executor or administrator. Conn. Gen. Stat. § 52-599; *Estate of Smith v. Town of West Hartford*, 129 F. Supp. 2d 146, 148 n.1 (D. Conn. 2002). A conservator's rights, by contrast, expire upon the death of the person being conserved and become the rights of the decedent's executor or administrator. Conn. Gen. Stat. § 45a-660(a)(3); *Prot. & Advocacy for Pers. with Disabilities v. Armstrong*, 266 F. Supp. 2d 303, 318 (D. Conn. 2003). That implies that a conservator loses the right to pursue a legal claim on behalf of the conservatee once the conservatee dies; upon the conservatee's death, that right is transferred to the decedent's executor. *Kleinman v. Marshall*, 192 Conn. 479, 483 (1984).

Ultimately, that distinction makes little difference because Birmingham is both Stenak's conservator and the co-executrix of his estate. As co-executrix, she is entitled to pursue a claim on behalf of her deceased father, such as the claim that the defendants, by entering him involuntarily into a marriage to Mirisola, deprived him of a liberty or property interest in

distributing his estate without due process. There are two possible constitutionally protected liberty interests of which Stenak was deprived: (1) the right to marry the person of his choice or otherwise remain a bachelor, and (2) the right to distribute his property after his death according to his wishes. Both of those are cognizable liberty and property interests, respectively, under Connecticut law. *See* Conn. Gen. Stat. § 46b-20a (stating that any person is eligible and has the right to marry, unless he or she is already married, is less than 18 years old, is subject to the supervision of a guardian or conservator, or his or her marriage would be incestuous); Conn. Gen. Stat. § 45a-250 ("Any person eighteen years of age or older, and of sound mind, may dispose of his estate by will."). The right to marry (or remain unmarried) is a liberty interest protected by the Due Process Clause. *See Cleveland Bd. of Educ. v. LaFleur*, 414 U.S. 632, 639-40 (1974) (noting that the Supreme Court "has long recognized that freedom of personal choice in matters of marriage and family life is one of the liberties protected by the Due Process Clause of the Fourteenth Amendment," and holding that a municipality may not "needlessly, arbitrarily, or capriciously impinge" on that freedom). And, as a general matter, the right to distribute or alienate one's estate is a property interest at the core of the Due Process Clause's protections. *Cf. Connecticut v. Doehr*, 501 U.S. 1, 11-12 (1991) (holding that effect of prejudgment remedy on property interests is significant, in part, because it "impairs the ability to sell or otherwise alienate the property," and noting that "our cases show that even the temporary or partial impairments to property rights that attachments, liens, and similar encumbrances entail are sufficient to merit due process protection").

That leads to the second step of the procedural due process analysis: whether Cotton's conduct, which contributed to the deprivation of those rights, amounted to a procedural due

process violation. To begin, it is helpful to review what Cotton purportedly did to wrong Stanek. Cotton filled out the marriage license for Stanek and Mirisola outside of their presence, including the section concerning whether Stanek had a conservator, and then signed the license without observing their signatures. All of that was in violation of Connecticut law and Southington's municipal regulations. *See* Conn. Gen. Stat. § 46b-25 ("No license may be issued by the registrar until both persons have appeared before the registrar and made application for a license."); § 46b-29(a) ("No marriage license may be issued to any applicant under the supervision or control of a conservator, . . . unless the written consent of the conservator, signed and acknowledged before a person authorized to take acknowledgments of conveyances under the provisions of section 47-5a, or authorized to take acknowledgments in any other state or country, is filed with the registrar."); Def. Ex. 9 (Southington policy for marriage, which requires couples to "appear in person with proper identification & complete an application before a license will be issued"). In other words, Cotton's conduct was not undertaken in accordance with authorized state and municipal procedures, but was performed in contravention of them.

When a government actor deprives an individual of a liberty or property interest through a "random or unauthorized act," and not according to "some established state procedure," there is no due process violation so long as the state provides a post-deprivation hearing. *Hudson v. Palmer*, 468 U.S. 517, 533 (1984); *Rivera-Powell*, 470 F.3d at 465; *see also Zinermon v. Burch*, 494 U.S. 113, 132 (1990) (holding that this rule applies to deprivation of liberty, in addition to property, interests). Although due process usually requires a contextual, case-by-case analysis, the Supreme Court has held that when a deprivation is caused by random or unauthorized acts of low-level government employees, the state need only provide a post-deprivation hearing to meet

its obligations under the Due Process Clause. *Zinermon*, 494 U.S. at 128. Such a post-deprivation hearing would include an action against the government in state court. *See Parratt v. Taylor*, 451 U.S. 527, 543-44 (1981) (holding that Nebraska provided prisoner with post-deprivation remedy in the form of a statutory cause of action in tort against the state); *Giglio v. Dunn*, 732 F.2d 1133, 1135 (2d Cir. 1984) (holding that post-deprivation state court proceeding was all the process due to public employee complaining of government's "random or unauthorized acts" against him).

Cotton, as stated above, was not acting according to any statutory or administrative policies when she filled out and signed Stenak's marriage license. Nor was she in a position of authority to enact any modifications to the rules governing the issuance of marriage licenses, *cf. DiBlasio v. Novello*, 344 F.3d 292, 302 (2d Cir. 2003) (clarifying that post-deprivation hearing may not be sufficient to remedy "random or unauthorized acts" by high-ranking officials with "final authority over significant matters" (quotation omitted)), or, for that matter, to finalize the marriage between Stenak and Mirisola, *see* Conn. Gen. Stat. § 46b-22 (listing class of people authorized to perform marriages and excluding administrative clerks). Thus, a post-deprivation hearing in which Birmingham can remedy her father's loss of liberty and property will satisfy the Due Process Clause.

The facts are undisputed that such post-deprivation opportunities exist and, furthermore, that Birmingham has taken advantage of them. With respect to the deprivation of Stenak's liberty interest in marriage, Birmingham has already commenced a lawsuit in state court to declare the marriage between Stenak and Mirisola invalid. *See* Def. Ex. O (state court ruling that Birmingham has standing to seek a declaratory judgment that her father's marriage is invalid

under state law).  There is no doubt, then, that a state remedy exists to correct any erroneous deprivation.  Furthermore, if she is successful in invalidating the marriage, Birmingham will be able to challenge Stenak's will in probate court and retake the share of her father's estate she purports was wrongly given to Mirisola.  *See* Conn. Gen. Stat. § 45a-257c (stating that if spouse's marriage to decedent is terminated after will's execution, then disposition of property to her under the will shall be revoked, unless the will provides otherwise); § 45a-98a (permitting party contesting term of a will to file for a jury trial in Superior Court).  That is an adequate remedy for the deprivation of Stenak's property interests.

The only argument that Birmingham puts forward for why those post-deprivation remedies are inadequate is that they are not fully compensatory.  First, she says that she will not be able to recoup punitive damages or attorneys' fees.  In *Parratt*, however, the Supreme Court was quite clear that the adequacy of a state's process depends only on a plaintiff's ability to be compensated for the loss of her liberty and property interests, and does not hinge on a plaintiff's capacity to win additional sums through litigation:

> It is argued that the State does not adequately protect the respondent's interests because it provides only for an action against the State as opposed to its individual employees, it contains no provisions for punitive damages, and there is no right to a trial by jury. Although the state remedies may not provide the respondent with all the relief which may have been available if he could have proceeded under § 1983, that does not mean that the state remedies are not adequate to satisfy the requirements of due process. The remedies provided could have fully compensated the respondent for the property loss he suffered, and we hold that they are sufficient to satisfy the requirements of due process.

451 U.S. at 543-44.  Birmingham also contends that she will never be able to obtain compensation for her father's loss of liberty – namely, his loss of the right to remain a bachelor –

during the four days he was married to Mirisola. Although a probate court could not award such compensation, Birmingham could sue Cotton and the Town of Southington in state court pursuant to Conn. Gen. Stat. § 52-557n for Cotton's negligence in performing the ministerial task of issuing a marriage license. Thus, there is no serious dispute that an adequate post-deprivation remedy exists in Connecticut and Birmingham's procedural due process claim fails.

Birmingham's remaining substantive due process claim against Cotton can be disposed of summarily. In order to succeed, Birmingham must demonstrate that the rights Stenak was deprived of were fundamental to the concept of ordered liberty and that Cotton's actions to grant the marriage license were shocking. I assume that the rights Birmingham is seeking to vindicate on her father's behalf are fundamental. What seems clear, however, is that Cotton's conduct does not shock the conscience.

"In order to shock the conscience and trigger a violation of substantive due process, official conduct must be outrageous and egregious under the circumstances; it must be truly brutal and offensive to human dignity." *Lombardi v. Whitman*, 485 F.3d 73, 81 (2d Cir. 2007) (quotation omitted). At most, Cotton was negligent in her failure to perform the proper procedures for administering the marriage license. She did not knowingly or intentionally act to deny Birmingham the opportunity to consent to Stenak's marriage. Nor could Cotton have acted with knowledge or purpose: she was not informed of Birmingham's conservatorship until after she returned to her office from Meade's home, where she had left the signed marriage license. "In gauging the shock, 'negligently inflicted harm is categorically beneath the threshold,' while 'conduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level.'" *Id.* at 82 (quoting *County of*

*Sacramento v. Lewis*, 523 U.S. 833, 849 (1998)). There is no genuine issue of fact with respect to Cotton's actions that would permit a jury to find a substantive due process violation. The defendants are therefore entitled to summary judgment on Birmingham's substantive due process claim.

      B.      <u>Claims against the Town of Southington</u>

The record shows that Birmingham has no claim against the Town of Southington because she does not meet the rule of *Monell v. New York Department of Social Services*, 436 U.S. 658, 691, 694 (1978), which limits section 1983 liability for municipalities to torts committed according to an "official municipal policy" or a municipal "custom." As explained in the previous section, Cotton issued Stenak's marriage license in direct violation of the Town's policy and state law. There is no evidence whatsoever that the Town of Southington had an official policy or regular practice of granting marriage licenses improperly, or that Cotton was a policy-maker capable of overriding Town regulations and Connecticut law.

There are also no facts indicating that Cotton was inadequately trained. As this Court has previously described the requirements for failure-to-train municipal liability:

> The Second Circuit has identified three requirements that a plaintiff must demonstrate before a municipality's failure to train or adequately supervise its employees can constitute "deliberate indifference" to its citizens' constitutional rights. *Walker v. City of New York*, 974 F.2d 293, 297 (2d Cir.1992) (citing *Harris*, 489 U.S. at 389-90, 109 S. Ct. 1197). The plaintiff must show: (1) "that a policymaker knows 'to a moral certainty' that her employees will confront a given situation," excluding rare or unforeseen events; (2) "that the situation either presents the employee with a difficult choice of the sort that training or supervision will make less difficult or that there is history of employees mishandling the situation;" and (3) "that the wrong choice by the city employee will frequently cause the deprivation of a citizen's constitutional rights" because training and supervision resources should be concentrated on "those situations where employee misconduct is

> likely to deprive citizens of constitutional rights." *Id.* at 297-98 (quoting *Harris*, 489 U.S. at 390 n.10, 109 S. Ct. 1197). At the summary judgment stage, a plaintiff "must 'identify a specific deficiency in the city's training program and establish that that deficiency is closely related to the ultimate injury, such that it actually caused the constitutional deprivation.'" *Jenkins v. City of New York*, 478 F.3d 76, 94 (2d Cir. 2007) (quoting *Green v. City of New York*, 465 F.3d 65, 81 (2d Cir. 2006)) (emphasis added).

*Seri v. Town of Newtown*, 573 F. Supp. 2d 661, 666-67 (D. Conn. 2008), *aff'd*, 2010 WL 1193714 (2d Cir. Mar. 30, 2010) (summary order).

Birmingham has identified no such deficiency in Southington's training program. The record shows, rather, that Cotton was very well trained: she took clerk certification classes for two years, graduated from the New England Municipal Clerks Institute, and has received several designations and awards for her work. Def. Ex. C, at 2. Cotton, who served as Southington's town clerk for 15 years before the incident in question, gave the following uncontradicted deposition testimony: "I obviously should have sworn the couple in myself in person. . . . It was – it's the first and only time that I issued a marriage license without doing that." Def. Ex. H, at 34. Cotton was well trained, but negligently deviated from the Town's procedures in this single instance. The fact that Birmingham's father was subject to official conduct that did not conform to the Town's and state's regulations is insufficient to demonstrate that Southington failed to train Cotton adequately. *See Jenkins*, 478 F.3d at 95 (holding that the fact that plaintiff was personally subject to misconduct did not, by itself, prove that a municipality was liable for failure to train). Summary judgment should therefore be awarded for the Town of Southington.

## IV. Conclusion

Birmingham is incapable of suing the defendants in her individual capacity or as her father's conservator, and is limited to vindicating her father's interests as the co-executrix of his

-17-

estate.  There are no genuine issues of material fact with respect to any of Birmingham's due process claims against Cotton and the Town of Southington in that capacity, however. Birmingham was afforded an adequate post-deprivation remedy; Cotton's conduct was merely negligent and does not shock the conscience; and there is no evidence showing that the Town of Southington had a policy or custom of wrongly issuing marriage licenses, or that it failed to train Cotton appropriately.

The defendants' motion for summary judgment (doc. # 58) is GRANTED.  The clerk shall close this file.

It is so ordered.

Dated at Bridgeport, Connecticut, this 30th day of September 2010.

/s/ Stefan R. Underhill
Stefan R. Underhill
United States District Judge